# In the United States Court of Federal Claims

No. 18-891 C
Filed: March 21, 2022
Re-issued: March 28, 2022[1]

_____
                                              )
DUKE ENERGY PROGRESS, LLC and                 )
DUKE ENERGY FLORIDA, LLC,                     )
                                              )
                *Plaintiffs*,         )
                                              )
  v.                                          )
                                              )
THE UNITED STATES,                            )
                                              )
                *Defendant*.         )
_____  )

*Brad Fagg*, with whom were *Paul M. Bessette* and *Jane T. Accomando*, Morgan, Lewis & Bockius LLP, Washington, D.C., for Plaintiffs.

*Evan Wisser*, Trial Attorney, with whom were *Brian M. Boynton*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, *Lisa L. Donahue*, Assistant Director, *Margaret Jantzen,* and *Matney Rolfe*, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., and *Jane K. Taylor*, U.S. Department of Energy, Office of the General Counsel, Washington, D.C., for Defendant.

## OPINION AND ORDER

**MEYERS, Judge.**

      In this Round 4 action, Plaintiffs sue to recover nearly $300 million in costs they contend result from the Government's partial breach of the standard contracts to collect spent nuclear fuel from four power stations between 2014-2018. The Government moves for partial summary judgment relating to claimed costs relating to Crystal River Unit 3, owned by Duke Energy Florida, LLC, on two grounds. First, the Government contends that because Judge Wheeler accepted an oldest-fuel-first model of Government performance in Round 2 of this litigation, Duke should be judicially estopped from arguing that it would have exchanged its spent fuel pickup slots with other utilities before 2009. The effect of judicial estoppel would be that Duke could not establish about $60 million of its claimed damages. The Government has made this

---

[1] The Court issued this opinion under seal and directed the Parties to confer and propose any redactions pursuant to the protective order. Because the Parties advise that no redactions are necessary, ECF No. 96, the Court re-issues this opinion in full.

oldest-fuel-first argument several times in prior rounds of this litigation, contending that Duke's "risk aversion" would have prevented it from utilizing exchanges because it would have meant coming too close to losing the ability to offload all the fuel in the core into the storage ponds. Despite the Government's persistence, its argument is at odds with this Court's holding in Round 2, which explicitly recognized that Duke established that it would have relied on exchanges in the non-breach world but that the oldest-fuel-first model presented the "worst case" scenario—*i.e.*, the best case for the Government. The difference between the two models clearly was immaterial to the Court's holding. That is fatal to the Government's judicial estoppel argument. In any event, Duke has also come forward with evidence that indicates it would have retained sufficient storage capacity using exchanges to overcome any risk aversion. Thus, any question of Duke's risk aversion is a topic for cross examination, not summary judgment.

Second, while disavowing reliance on collateral estoppel (an argument this Court denied once already in this round of litigation), the Government moves for partial summary judgment based on the "logic" of the Round 3 decision. It is hard to understand this as anything but a collateral estoppel argument—especially because the Government explicitly argues for the Court to invoke collateral estoppel. But this non-collateral-estoppel-collateral-estoppel argument fails to provide a basis for summary judgment for many of the same reasons it failed to provide a basis for dismissal. As Judge Wheeler held, the claims and defenses are different here following Duke's decision to retire Crystal River permanently. These factual disputes here center around how quickly Duke would have been able to transfer the spent fuel after Duke decided to permanently retire Crystal River, which simply were not at play in Round 3. The Court, therefore, denies the Government's motion for partial summary judgment. This case will proceed to trial as scheduled.

**I.      Background[2]**

      **A.      The Nuclear Waste Policy Act and Partial Breach of the Standard Contract.**

Congress enacted the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270, to address the handling and disposal of spent nuclear fuel ("SNF") coming out of civilian nuclear reactors. Generally, plant operators were responsible for interim SNF storage costs until the Department of Energy ("DOE") would have begun to accept the SNF. *Id.* § 10131(a)(5). The Government and Duke[3] entered Standard Contract No. DE-CR01-83NE44382 for the disposal of spent fuel at Crystal River. ECF No. 1 ¶ 7.

---

[2] While Duke Energy Progress, LLC and Duke Energy Florida, LLC bring this action for costs they claim are associated with four power plants, the Government's motion only challenges some of the costs at the Crystal River Plant. Therefore, the Court limits this background to facts relevant to Crystal River. And because Duke Energy Florida owns Crystal River and is the party opposing dismissal, the Court will refer to it simply as "Duke" unless otherwise indicated. Nothing in this Opinion constitutes findings of fact.

[3] Duke Energy Florida, LLC is the current name of Florida Power Corporation, the signatory to the contract governing the removal of SNF at Crystal River. ECF No. 1 ¶ 7. Because there is no distinction between them relevant to this case, the Court refers only to Duke in this Opinion.

The Contract required DOE to take Crystal River's SNF for disposal beginning no later than January 31, 1998, and continuing until no further SNF remained at Crystal River. *Carolina Power & Light Co. v. United States*, 115 Fed. Cl. 57, 60 (2014). To date, the Government has not taken any SNF from Crystal River or any other facility. By default, the Government would take the oldest SNF from the civilian reactors around the country first. *See* ECF No. 60-1[4] at A12 (Contract[5] Art. IV.B.5). In other words, the Government would take small amounts of SNF from many reactors around the country each year. But the Contract also allowed the utilities to exchange their pickup slots with each other with the Government's approval. *Id.* at A14 (Art. V.E). This would allow the more efficient collection of SNF because the Government would take larger amounts of SNF from fewer reactors each year. It is widely accepted that the utilities would have exchanged their pickup slots with each other because the exchanges would make the collection of SNF more efficient. *E.g.*, *Portland Gen. Elec. Co. v. United States*, 107 Fed. Cl. 633, 645 (2012) ("We also credit the evidence that DOE would have encouraged exchanges and been cooperative with exchange requests. There would have been no incentive for it not to have cooperated.").

In Round 2, Duke relied on an oldest-fuel-first ("OFF") model to prove that DOE's partial breach was a substantial causal factor of each claimed mitigation cost. "At trial [Duke] showed that by using just Crystal River's own allocations to remove SNF, Crystal River could have all its SNF removed by 2025." *Carolina Power*, 115 Fed. Cl. at 65. The Round 2 dispute involved whether Duke could recover planning costs for a dry storage facility at Crystal River. Judge Wheeler found that Duke was entitled to its claimed damages and awarded $21,143,438. *Id.* at 64-65.

## B. Crystal River's Delamination Event.

In Round 3, the dispute involved whether costs due to a delamination event at Crystal River were recoverable. *Duke Energy Progress, Inc. v. United States*, 135 Fed. Cl. 279 (2017). As part of a refueling and upgrade project, Duke shut down Crystal River in 2009. ECF No. 1 ¶ 35. The project included the replacement of Crystal River's steam generators to increase the capacity of the plant. *Duke Energy Progress*, 135 Fed. Cl. at 288. Although operators often retain specialist firms to perform such renovations, Duke decided to self-manage the project. *Id.* Duke did obtain the advice of two specialized firms that both recommended releasing the tension on 65 steel tendons to relieve stress on the concrete building housing Crystal River. *Id.* Duke, however, chose to release the tension on only 27 steel tendons. *Id.* at 288-89. As a result, there

---

[4] The Government removed certain pages from its Motion's appendix, ECF No. 53-1, prior to filing. This rendered many of the appendix citations in its motion inaccurate. The Government filed a corrected appendix with its reply that fixes these problems. ECF No. 60-1. The Court cites to the corrected appendix throughout.

[5] Although the Government identifies the contract in its appendix as the one for Crystal River, it is, in fact, the standard contract for the three Duke Energy Progress plants *not* at issue in this Opinion. *See* ECF No. 60-1 at A3 (contract with Carolina Power & Light Co.) & A37-41 (identifying the reactors covered by the contract, none of which is Crystal River). Because this is a standard contract and the Parties do not identify any difference between the provided contract and the Crystal River contract, the Court relies upon this contract in this Opinion.

was a delamination of concrete in Crystal River's containment structure around the reactor. *Id.* at 289. At the same time, Duke was building a dry storage facility at Crystal River. *Id.* Following the delamination event, Duke suspended work on that dry storage facility, which may not have been necessary after Duke chose to permanently shut down Crystal River. *Id.* Construction of the existing Crystal River dry storage was not completed until 2017. In early January 2018 the final SNF was removed from Crystal River's pool and placed into dry storage. ECF No. 1 ¶ 37.

The Court held that Duke's unforeseeable mismanagement of the renovation project broke the causal chain between DOE's breach and Duke's claimed damages resulting from the delamination event. *Duke Energy Progress*, 135 Fed. Cl. at 289. Therefore, Judge Wheeler denied Duke's claimed damages caused by the delamination event.

### C. Duke Retires Crystal River.

Following the delamination event, Duke announced the permanent shutdown of Crystal River in February 2013. ECF No. 1 ¶ 36. Duke did not transfer the last of the Crystal River SNF from the spent fuel pool to dry storage until January 2018. *Id.* ¶ 37. Duke alleges that it incurred post-shutdown operations, maintenance, and security costs associated with storing Crystal River's SNF within its spent fuel pool from January 1, 2014, through December 31, 2018 ("wet-pool costs"). *Id.* ¶ 38. Duke contends that but for DOE's failure to fulfill its contractual obligations and accept Crystal River's SNF when the plant was shut down in early 2013, its associated wet-pool costs would not have been incurred. *Id.* The Government moved to dismiss Duke's wet-pool costs, arguing that collateral estoppel precluded these claims. Judge Wheeler denied the Government's motion because its application of Round 3's findings concerning "foreseeability, culpability, and causation . . . [were] overstated," there are "new issues of fact and law[,]" such that "[c]ollateral estoppel does not apply here." *Duke Energy Progress, Inc. v. United States*, 141 Fed. Cl. 230, 234 (2019). Primary among the new issues of fact and law is "whether Crystal River's retirement and any shutdown related costs, as an entirely distinct type of loss, were foreseeable." *Id.*

## II. Legal Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rules of the Court of Federal Claims ("RCFC") 56(a). The initial burden on the movant is to show that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the movant does so, the burden shifts to the nonmovant to show the existence of a genuine dispute of a material fact, which can be achieved by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." RCFC 56(c)(1). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A "genuine" dispute of material fact exists where a reasonable factfinder "could return a verdict for the nonmoving party." *Id.* at 248. "Material" facts are those "that might

4

affect the outcome of the suit under the governing law," as opposed to "disputes that are irrelevant or unnecessary." *Id.*

"The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Therefore, "[a]ny doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs." *BES Design/Build, LLC v. United States*, 157 Fed. Cl. 241, 268 (2021) (citations omitted). But "'a nonmovant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law.'" *Id.* at 269 (quoting *Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1369 (Fed. Cir. 2006)).

## III. Discussion

### A. Judicial estoppel does not apply.

#### 1. Judicial estoppel.

Judicial estoppel provides that "'where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, [it] may not thereafter, simply because its interests have changed, assume a contrary position, especially if it be to the prejudice of the [other] party.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). "Judicial estoppel is designed to prevent the perversion of the judicial process and, as such, is intended to protect the court rather than the litigants." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996). In essence, judicial estoppel prevents litigants from "playing fast and loose with the courts." *Wang Labs., Inc. v. Applied Comput. Sciens., Inc.*, 958 F.2d 355, 358 (Fed. Cir. 1992) (quoting *Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, 212 (1st Cir. 1987)). In the end, judicial estoppel "'is an equitable doctrine invoked by a court *at its discretion*.'" *New Hampshire*, 532 U.S. at 750 (emphasis added) (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)).

While there is no exhaustive set of criteria for judicial estoppel, there are several factors that generally inform the Court's analysis. *Id.* The Federal Circuit has found these factors to be whether: (1) Duke's "later position is clearly inconsistent with its earlier position; (2) . . . [Duke] succeeded in persuading a court to accept [its] earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) [Duke in] seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Trs in Bankr. of N. Am. Rubber Thread Co. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2010) (internal quotations and citations omitted).

#### 2. Nothing in Round 2 justifies the application of judicial estoppel here.

The Government moves to estop Duke from presenting evidence that it would have traded away pickup rights prior to 2009 based on Duke's arguments and this Court's holding in Round 2 that employed an OFF model. ECF No. 53 at 19-20. According to the Government, "Duke cannot demonstrate that it would have removed all spent fuel by 2015 if required to

5

assume that Duke did not trade away its pickup rights between 1998 and 2008, as the Court found in the prior round." *Id.* at 13.  But the Government's argument fails to accept that Judge Wheeler expressly found that Duke established that it *would* have utilized exchanges prior to 2009 but the Court analyzed Round 2 under the OFF model because it was the "worst case" for Duke—*i.e.*, the most beneficial to the *Government*.  *Carolina Power*, 115 Fed. Cl. at 65. Because none of the *New Hampshire* factors favor estoppel, the Court denies the Government's motion.[6]

> *a)    Duke's current position is not clearly inconsistent with its Round 2 argument or Judge Wheeler's Opinion.*

The Court must first determine whether Duke's argument here is clearly inconsistent with its arguments in Round 2.  The Government argues that "[i]n round two, Duke told this Court that it definitely would have had DOE pickup its fuel from Crystal River at the earliest opportunity between 1998 and 2008" but is now saying "it definitely would have traded away those same pickup rights."  ECF No. 53 at 22.  Duke responds that whether the Government took SNF under OFF or the exchanges, the result in Round 2 would have been identical.  ECF No. 55 at 22.  This is because "by definition, a utility's spent nuclear fuel damages recovery will never be less under an exchanges theory than under an oldest fuel first approach" as "[t]his Court, in the very case upon which the government's whole argument depends, so held."  *Id.* at 2 (citing *Carolina Power*, 115 Fed. Cl. at 66).

In Round 2, Duke did not argue that it "definitely would have" relied on an OFF model. Under an OFF model, the Government would have taken all SNF from Crystal River by 2025, meaning that it made no business sense to undertake dry storage for no more than nine years of use.  *Carolina Power*, 115 Fed. Cl. at 65.  But Judge Wheeler unquestionably understood that the 2025 fuel out date—*i.e.*, the OFF model—was a "worst case scenario."  *Id.*  In other words, this was the latest date by which the Government would have taken the last SNF from Crystal River. But this does not mean that Duke "definitely would have had DOE pickup its fuel from Crystal River at the earliest opportunity between 1998 and 2008" as the Government argues.  ECF No. 53 at 22.  Indeed, that argument requires this Court to ignore Judge Wheeler's conclusion that "[Duke] further explained that this worst case assumption would not reflect DOE performance because *Duke Energy operates as a single fleet and would have utilized inter-utility exchanges* to remove the SNF on an expedited basis."  *Carolina Power*, 115 Fed. Cl. at 65 (emphasis added). Judge Wheeler did not make this up.  He relied on Duke's arguments to reach this conclusion. And there was post-trial briefing on this specific issue.  ECF No. 55 at 22-23.  There is no material inconsistency between using a worst-case OFF model in Round 2 with the specific understanding that Duke would have relied on more efficient exchanges and allowing Duke to argue an exchange-based model here.  In fact, Judge Wheeler rejected the Government's attempt to lock Duke into an OFF model going forward, because "[s]uch a finding would *likely be at*

---

[6] Duke asserts that the Government waived its judicial estoppel argument by failing to plead it as an affirmative defense in its Answer.  Because the argument fails on the merits, the Court assumes the Government may raise judicial estoppel and does not wade into the waiver issue, which has divided the courts.

*odds with the evidence introduced at trial* and with common sense assumptions about how DOE would respond to a plant's closing." *Carolina Power*, 115 Fed. Cl. at 66 (emphasis added).

### b) Neither Judge Wheeler nor this Court has been misled.

The Government premises its argument that either Judge Wheeler or this Court was misled on the fact that in Round 2, "Duke recovered $21 million in costs related to its planning and development of a dry storage facility at Crystal River." ECF No. 53 at 12-13. And the Government insists that the Court could not have found the Government liable for these damages unless it adopted an OFF model. *Id.* The Government insists that Duke impermissibly flipped its position here because "Duke now claims that it would not have asked DOE to pick up any fuel from Crystal River between 1998 and 2008, contrary to its prior factual position." *Id.* at 13. Thus, the Government argues "[i]f the Court were to award Duke damages in this case based on its changed position, it would imply that either the first Court or this Court had been misled." *Id.* at 14. Not so.

As should be clear by now, Judge Wheeler did not adopt "Duke's" argument that it would not have used exchanges before 2009, apparently because Duke made no such argument in Round 2. As Duke explains, it focused on an OFF model in Round 2 because the Government did not contest it and Duke could recover fully under that model, therefore, it chose "the path of least resistance." ECF No. 71 at 36:14-37:8. But Duke also explained that it would have used exchanges, as Judge Wheeler explicitly found. There is nothing about relying on the OFF model in Round 2 that precludes Duke's argument here.

Despite Judge Wheeler's explicit finding that Duke *would* have used exchanges, the Government insists that the Round 2 award to Duke for dry storage costs could only be the result of Duke's arguing that it would have relied on an OFF model. *Id.* at 23-24. According to the Government, Judge Wheeler's Round 2 decision required his holding that "the management of [Duke] would never approve of the construction of a dry storage facility, if DOE had been performing, because of the associated risks and costs." *Id.* at 23 (quoting *Carolina Power*, 115 Fed. Cl. at 65). And this includes the associated risk of running out of full core reserve[7] in Duke storage ponds. The Government's argument miscomprehends Judge Wheeler's Round 2 opinion.

The "risks and costs" that Judge Wheeler found in Round 2 were Crystal River's compact size (making dry storage construction more difficult), the extensive permitting required, and the soil remediation that was necessary for dry storage. *Carolina Power*, 115 Fed. Cl. at 61. And with the high cost and risks of dry storage it "would have made no business sense to construct dry storage at Crystal River that would only be used for nine years." *Id.* at 65. Of course, the nine years is based on a fuel out date of 2025, which is the result of an OFF model. *Id.* But Judge Wheeler expressly found this 2025 date to be the "worst case," meaning that the real-world fuel out date would have been earlier than 2025 "because Duke Energy operates as a single fleet and would have utilized inter-utility exchanges to remove the SNF on an expedited

---

[7] As one of Duke's expert witnesses explains in his report: "Operating nuclear plants generally make it a policy to hold a 'full core reserve' (FCR)—sufficient space in the spent fuel pool to accommodate the discharge of all the fuel in the reactor core." ECF No. 55-1 at 10 n.4.

7

basis." *Id.* Of course, if it made no sense to build dry storage for only nine years of use, it would make increasingly less sense to build it for fewer than nine years. Nothing about this holding precludes Duke's arguments here.

It is also true that Judge Wheeler found that Duke did undertake the dry storage project "because the company expected that the unit would soon run out of space and lose full core reserve in its pools." *Id.* The Government believes that this need to maintain full core reserve meant that Duke would not utilize exchanges because it would be averse to allowing its storage pools to fill to the ragged edge of running out of full core reserve. ECF No. 53 at 23. This may be true. But Duke has come forward with evidence showing that even under its exchange-based model, it would have maintained sufficient capacity to offload the reactor core fuel plus six years' worth of output from Crystal River. *See* ECF No. 71 at 29:2-32:24.

Specifically, Crystal River's storage ponds had the capacity to store 1,474 SNF assemblies. Joint Stipulations of Fact ¶ 20, *Carolina Power & Light Co. v. United States*, No. 11-869C (Fed. Cl. Sept. 6, 2013). It is also undisputed that full core reserve for Crystal River was 177 assemblies. ECF No. 60-1 at A74. And it does not appear disputed that Crystal River generated 1,243 assemblies of SNF (approximately 582 metric tons) prior to the 2009 shutdown, all of which is stored on site. ECF No. 55-1 at 3. Under the OFF model, Duke would have maintained capacity for another 585 assemblies.[8] Under Duke's exchange model, it would have maintained capacity for 246 assemblies.[9]

Given that Crystal River generated around 80 SNF assemblies every other year, ECF No. 60-1 at A74, Duke's exchange model would leave approximately a six-year capacity reserve. Duke contends that this was not too close for its comfort, particularly after 2009 when the Crystal River reactor shut down and stopped producing more SNF to go into the storage ponds. ECF No. 55 at 19. Whether this is enough cushion to satisfy Duke's "risk aversion" is a question for cross examination, not summary judgment.

> c)   The Court's denying judicial estoppel does not create an "unfair advantage" for Duke nor an "unfair detriment" for the Government.

According to the Government, if the Court allows Duke to argue that it would have used exchanges prior to 2009, Duke will gain an unfair advantage—the $21 million recovery for dry storage planning at Crystal River from Round 2. ECF No. 53 at 24. This, of course, is premised on the conclusion that Judge Wheeler's opinion required the OFF model. That does not comport

---

[8] Under the OFF model, the Government would have taken 531 assemblies from Crystal River by 2010. ECF No. 60-1 at A74 (sum of the Ship to DOE column). Therefore, there would have been 712 assemblies on site, 1,474 minus 531. Maintaining full core reserve would leave capacity for another 585 assemblies: 1,474-712-177 = 585.

[9] Under Duke's exchange model, the only thing that changes in the calculation is the amount of SNF picked up by 2009. Duke's expert projects that it would have transferred 192 assemblies by 2009 in his model. ECF No. 55-1 at 33. This would leave 1,051 assemblies on site: 1,474-192=1,051. As a result, Duke would have maintained full core reserve and capacity for another 246 assemblies: 1,474-1,051-177 = 246.

with Judge Wheeler's opinion. Again, it's hard to accept the Government's argument when Judge Wheeler explicitly states that Duke would have used exchanges in the real world. The only conclusion this Court can take from that statement is the OFF versus exchange issue would have made no difference in Round 2. And the Government has not presented, nor has the Court found, any case in which an issue that makes no difference to the outcome of a case justified the application of judicial estoppel in a future case.

### B.    Judge Wheeler's Round 3 opinion does not preclude Duke's claimed costs.

The Government seeks "to prevent Duke from recovering $27,816,696 in spent fuel storage costs that resulted from Duke's decision to delay construction of a dry storage facility at Crystal River after Duke mismanaged the steam generator replacement project there." ECF No. 60 at 9-10; *see also* ECF No. 53 at 27-30. The Government asserts that it relies on the "logic" of Judge Wheeler's Round 3 decision rather than collateral estoppel. ECF No. 53 at 28. Duke counters that if the Government's argument is not collateral estoppel, "then it is nothing." ECF No. 55 at 26. In denying the Government's motion to dismiss in this round of litigation, Judge Wheeler held that "collateral estoppel does not apply here" because "the dry storage and contract termination costs from round three and the wet-pool costs at issue here are not simply interchangeable . . . [t]hey are two different sets of costs which involve different evidence and a different factual record." *Duke Energy Progress*, 141 Fed. Cl. at 234.

Before turning to the merits, it is difficult to understand the Government's motion as seeking anything other than collateral estoppel. Even though it disclaims collateral estoppel, the Government explicitly argues that collateral estoppel precludes Duke from proving its claims. *Id*. Within two paragraphs, the Government goes from "[t]he United States does not renew our prior argument that collateral estoppel bars Duke's claim for its incremental suspension-based costs in this round" to "[c]ollateral estoppel does, however, preclude Duke from disputing the material facts underlying the legal determination of which costs should be excluded." ECF No. 53 at 28. Thus, the Government argues "on the merits, Duke cannot establish that the costs identified in our motion were caused by the breach, precluding their recovery." ECF No. 60 at 9. Duke's response is quite simple—the issues are not the same and there are new disputed facts that preclude summary judgment based on the Government's modified collateral estoppel theory. ECF No. 55 at 28-29. Whatever the precise nature of this non-collateral-estoppel-collateral-estoppel argument is, it fails because the facts at issue here are distinct from those in Round 3.

The Government's disclaiming collateral estoppel is even more puzzling because it concedes that to prevail it must meet the *Shell Petroleum* standard for establishing collateral estoppel. ECF No. 53 at 28. Thus, the Government must prove *inter alia* that "the issue is identical to the one decided in the first action." *Id*. (quoting *Duke Energy Progress*, 141 Fed. Cl. at 233 (citing *Shell Petrol., Inc. v. United States*, 319 F.3d 1334, 1338 (Fed. Cir. 2003))). The issues are not identical.

The primary factual question regarding the challenged storage costs is whether they would have been incurred in a non-breach world. As is clear from the Government's assertions, it believes that the delamination at Crystal River caused Duke to delay building the already planned dry storage facility there. Relying on its experts' depositions, the Government contends that Duke's decision to retire Crystal River had no impact on the actual need for or timeline to

9

complete dry storage.  *Id.* at 29-30.  Therefore, the Government's expert concluded that had there not been a delay in the dry storage resulting from the delamination event, Duke would have offloaded all its SNF into dry storage by the end of 2015 and the Government is not liable for any wet storage costs after that.  *Id.*

Relying on its experts, Duke responds that had the Government been performing, none of the wet or dry storage costs would have been necessary, meaning the Government is liable.  Specifically, Duke contends that in a non-breach world it would have accelerated its transfer of all the SNF from Crystal River after the shutdown.  ECF No 55 at 28.  And Duke's expert opines that "there would have been more than sufficient time from the retirement decision in February of 2013 to load [the remaining] 1,051 assemblies into transportation casks to DOE by the end of 2015."  ECF No. 55-1 at 33.  If this is correct, none of the claimed costs would have been necessary but for the Government's failure to receive SNF.

The ability to remove all SNF between 2013 and 2015 was simply not before the Court in Round 3.  Collateral estoppel provides no basis to preclude Duke's claim.  It may be, as the Government contends, that all the costs here are precluded for the same reason that Judge Wheeler found costs excluded in Round 3—because Duke mismanaged Crystal River.  But it may also be that but for the Government's breach there would not have been any need for the claimed storage costs here because Duke would have been able to remove all SNF by the end of 2015 when these costs began to accrue.

Two things are clear.  First, those issues are not identical to Round 3.  Second, these disputed factual assertions are hornbook reasons to have a trial.

## IV.    Conclusion

For the reasons stated above, the Government's Motion for Partial Summary Judgment, ECF No. 53, is **DENIED**.

**IT IS SO ORDERED.**

s/ Edward H. Meyers  
Edward H. Meyers  
Judge

10